**United States District Court**
**For the**
**Northern District of Iowa**
**Eastern Division**

_____

| | | |
|---|---|---|
| LYNNE SEABROOKE | * | No. 6:10-cv-02028-LRR |
| | * | |
|     Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| UPPER IOWA UNIVERSITY, | * | |
| | * | PLAINTIFF'S TRIAL BRIEF |
|     Defendant. | * | |

_____

## TABLE OF CONTENTS

I.    Statement of Facts . . . . . . . . . . . . . . . . . 2

II.   Statement of Law . . . . . . . . . . . . . . . . . . 6

      A. _42 U.S.C. § 12101, et al._ . . . . . . . . . . . 6

      B. _Iowa Code § 216_ . . . . . . . . . . . . . . . 11

III. Analysis . . . . . . . . . . . . . . . . . . . . . . 13

      A. The Plaintiff is a disabled individual who could
         perform the essential functions of her position.

      B. The Defendant took adverse employment action based on
         the Plaintiff's disability by failing to reasonably
         accommodate the Plaintiff's workload, segregating the
         Plaintiff from the interview process, and treating her
         differently than similarly situated employees

      C. The Defendant's basis for terminating the Plaintiff
         for conduct was pretextual.

      D. The Plaintiff is entitled to recover for all damages
         suffered including: past, present and future lost
         wages and benefits, past, present and future emotional
         distress, attorney fees, and punitive damages.

IV.  Conclusion . . . . . . . . . . . . . . . . . . . . . 22

## STATEMENT OF FACTS

The Plaintiff, Lynne Seabrooke (hereinafter "Seabrooke"), was first employed with Upper Iowa University (hereinafter "Upper Iowa") from 1993 to 2001. Seabrooke resigned her position in 2001 under amicable terms. Seabrooke was re-hired by Upper Iowa on September 17, 2004 as an administrative assistant in Fayette, Iowa. She was later promoted to the position of Assistant Registrar, International programs. Her last position with Upper Iowa was International Enrollment Advisor. As International Enrollment Advisor, Seabrooke was responsible for the maintenance of academic records for all current, former, and prospective students for the employer's five locations in Malaysia, Hawaii, and Canada. During Seabrooke's period of employment, there were two International Enrollment Advisors at Upper Iowa: Seabrooke and Virginia Larimer (hereinafter "Larimer"). Seabrooke worked under the direction of two supervisors, Dr. DeWayne Frazier (hereinafter "Frazier") and Christopher Sanders (hereinafter "Sanders").

Despite Seabrooke and Larimer being in peer positions, Seabrooke consistently serviced several hundred students more than Larimer. The additional workload caused Seabrooke stress and difficulty. At several times Seabrooke requested from her supervisors assistance with her workload. Upper Iowa and Seabrooke initially discussed hiring a full-time employee to

2

assist Seabrooke with her workload; however, a full-time employee was never hired. Upper Iowa hired a part-time employee, Cathy Langel (hereinafter "Langel"). During the interview process, Seabrooke was deliberately, and clandestinely, excluded from the interview process. Seabrooke felt betrayed and ostracized by her exclusion from the interview process which further affected her mental condition. When Seabrooke confronted her supervisors about her secret exclusion, it was described as a "miscommunication"; in reality, it was a deliberate attempt to segregate Seabrooke and exclude her from any input in relation to the individual allegedly being hired to work with and assist Seabrooke.

During the course of Seabrooke's second employment, she suffered from post-traumatic stress disorder, depression, and anxiety. Her current condition began around 2002 when she was seen at Howard County Regional Hospital in Cresco, Iowa. She has consistently been treated by Backbone Counseling (now known as Abbe Center) in West Union, Iowa under the Care of Mary Funke, Barb Fey, Richelle Bouska, and Dr. Douglas Jones. She has also been seen by Gundersen Lutheran, Palmer Lutheran, Covenant Medical Center, and Allen Hospital. Her condition caused her to miss work on several occasions, including in-patient hospitalization on two occasions. Upper Iowa was aware of her conditions and communicated with her treatment provider

3

on several occasions concerning her mental state through emails between Frazier and Mary Funke. Additionally, on one occasion Seabrooke communicated to Frazier that she was contemplating suicide as a result of her mental state. As a result of her comments to Frazier, Sanders became concerned and provided Seabrooke with a telephone hotline. Seabrooke's mental health condition was detrimentally affected by her work environment and Upper Iowa's unreasonable workload expectations in comparison with Larimer, a similarly situated employee.

Upper Iowa did move Seabrooke's desk; however she was facing a wall, not a window as proposed by her counselor. They also obtained glare guards for her computer and new lights. None of these actions addressed the excessive workload of Seabrooke. The hiring of less than part time employee Langel compounded the workload problem for Seabrooke as she was not trained to perform the duties where Seabrooke needed the most assistance and Seabrooke had to train Langel. Seabrooke pleaded on several occasions for help with her workload.

Despite Seabrooke's mental disability, she excelled in her position as International Enrollment Advisor. Seabrooke's 2007 and 2008 annual reviews were extremely positive; her 2008 review by Sanders indicated that she was the "best in Iowa" at her position. It was not until the excessive workload demands were not being appropriately addressed by her supervisors that

4

Seabrooke's mental impairment began to deteriorate her work. These problems caused friction between Seabrooke and her supervisors. On October 7, 2008, Frazier sent an email to Seabrooke alleging three instances of insubordination, one of which stemmed from the secret interviewing of Langel, and Sanders false statements to Seabrooke thereafter. Within that email, Frazier demanded medical documentation to determine whether or not Seabrooke had a qualifying disability and stated "[f]urther, Upper Iowa University is unable to engage in a dialogue with you as to whether there may be a reasonable accommodation which would allow you to perform the essential functions of your job."

Between October 7, 2008 and February 17, 2009, there were no further allegations of misconduct. On February 17, 2009, there was an instance where information was incorrectly sent by Larimer and Langel when Seabrooke was out of the office to a former partner institution that was no longer affiliated with Upper Iowa. Seabrooke addressed it with Larimer and later with Langel. After the conversation, and sometime in the mid-morning, Larimer very angrily went into Seabrooke's office and yelled at Seabrooke causing Frazier to intervene and physically restrain and remove Larimer from Seabrooke's office. Larimer was not reprimanded for her conduct.

5

Seabrooke was placed on administrative leave at approximately noon on February 17, 2009. She was officially terminated on February 26, 2009 by a letter from Donald Aungst, Senior Vice President of the employer. Since her termination, Seabrooke has been unable to find comparable employment. She has earned less than $10,000 since her termination. She has regularly attempted to find employment. Her termination from Upper Iowa has created a black mark on her ability to secure future employment.

Seabrooke's termination was in violation of 42 U.S.C § 12101 et al. and Iowa Code § 216.2(5) as her termination was based on her mental impairment. Upper Iowa is a covered entity pursuant to federal and state law, as an employer of more than 15 employees for more than 20 calendar weeks in the current or preceding year. Furthermore, Upper Iowa failed to reasonable accommodate Seabrooke, treated Seabrooke differently than similarly situated employees, and failed to satisfactorily engage in dialogue concerning a reasonable accommodation.

## STATEMENT OF LAW

### A. *42 U.S.C. § 12101, et al.*

Federal law provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation,

6

job training, and other terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a). "In the absence of evidence of direct discrimination, ADA claims are evaluated by the burden-shifting framework of **McDonnell Douglas Corp. v. Green**, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)." **Kratzer v. Rockwell Collins, Inc.**, 398 F.3d 1040, 1044 (8th Cir. 2005). First, the plaintiff must make a prima facie case of disability discrimination. **Id.** If the plaintiff makes a prima facie case of discrimination, the employer must offer a legitimate, nondiscriminatory reason for the adverse employment action. **Id.** If the employer offers a legitimate, nondiscriminatory reason, the employee must show that the reason was pretextual. **Id.** To make a prima facie case of discrimination based on disability, the employee "must show that (1) the employee is disabled within the meaning of the ADA; (2) the employee is qualified (with or without reasonable accommodation) to perform the essential functions of a job; and (3) the employee suffered an adverse employment action because of the disability." **Henderson v. Ford Motor Co.**, 403 F.3d 1026, 1034 (8th Cir. 2005).

A "disability" is defined as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual". 42 U.S.C. § 12102(2). The definition consists of two parts: (1) a physical or mental impairment; and (2) a limitation that substantially limits one

7

or more major life activities. **Nuzum v. Ozark Auto Distribs.**
432 F.3d 839, 843 (8th Cir., 2005). Major life activities
"include, but are not limited to, caring for oneself, performing
manual tasks, seeing, hearing, eating, sleeping, walking,
standing, lifting, bending, speaking, breathing, learning,
reading, concentrating, thinking, communicating, and working."
42 U.S.C. § 12102(2)(A). The definition of disability is
construed broadly. 42 U.S.C. § 12102(4)(A). An impairment that
is "episodic or in remission is a disability if it would
substantially limit a major life activity when active." 42
U.S.C. § 12102(4)(D). "'[S]ubstantially limits' shall be
interpreted consistently with the findings and purposes of the
ADA Amendments Act of 2008." 42 U.S.C. § 12102(4)(B). In
determining whether or not a physical or mental condition
"substantially limits" a person, "ameliorative effects of
mitigation measures" of medication, medical supplies, and
equipment are not taken into consideration. 42 U.S.C §
12102(4)(E)(i).

In relation to employee conduct, "[f]or purposes of the
ADA, with a few exceptions, conduct resulting from a disability
is considered to be part of the disability, rather than a
separate basis for termination." **Humphrey v. Mem'l Hosps.**
**Ass'n**, 239 F.3d 1128, 1139-1140 (9th Cir., 2001). The **Humphrey**
Court continues that "[t]he link between the disability and

termination is particularly strong where it is the employer's failure to reasonably accommodate a known disability that leads to discharge for performance inadequacies resulting from that disability." **Id.** at 1140.  The 10th Circuit states:

> Mental illness is manifested by abnormal behavior, and is
> in fact normally diagnosed on the basis of abnormal
> behavior. See Diagnostic and Statistical Manual of Mental
> Disorders 350 (4th ed. 1994) (stating that bipolar disorder
> may be diagnosed "by the occurrence of one or more Manic
> Episodes or Mixed Episodes"). To permit employers carte
> blanche to terminate employees with mental disabilities on
> the basis of any abnormal behavior would largely nullify
> the ADA's protection of the mentally disabled.

**Den Hartog v. Wasatch Academy**, 129 F.3d 1076, 1087 (10th Cir., 1997).

Discrimination against a qualified employee on the basis of disability includes "limiting, **segregating**, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee."  42 U.S.C. § 12112(b)(1)(emphasis added).  Discrimination includes failing to reasonably accommodate an employee's mental or physical limitations, unless the accommodation would create an undue hardship.  42 U.S.C. § 12112(b)(5)(A).  On claims that the employer failed to reasonably accommodate an employee, the Court utilizes a "modified burden-shifting analysis." **Canny v. Dr. Pepper/Seven-Up Bottling Group, Inc.,** 439 F.3d 894, 900 (8th Cir., 2006).  The plaintiff must make a facial showing of a

9

disability under the ADA, and then that she is a "qualified individual." **Id.** The term "qualified individual" means a person "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Reasonable accommodations may include: "making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(A)-(B).

For a cause of action for failure to accommodate, Seabrooke must show that: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability. **EEOC v. Sears, Roebuck & Co.**, 417 F.3d 789, 797 (7th Cir., 2005)(citing **Hoffman v. Caterpillar**, **Inc**., 256 F.3d 568, 572 (7th Cir. 2001)). To reasonably accommodate, the "ADA requires that employer and employee engage in an interactive process to determine a reasonable accommodation." **Id.** (quoting **Baert v. Euclid Beverage, Ltd**., 149 F.3d 626, 633 (7th Cir.

1998)). "If a disabled employee shows that her disability was not reasonably accommodated, the employer will be liable only if it bears responsibility for the breakdown of the interactive process." **Id.** (citing **Beck v. Univ. of Wisc. Bd. Of Regents**, 75 F.3d 1130, 1137 (7th Cir. 1996)). "An employer impedes the process when: the employer knows of the employee's disability; the employee requests accommodations or assistance; the employer does not in good faith to assist the employee in seeking accommodations; and the employee could have been reasonably accommodated but for the employer's lack of good faith." **Kratzer**, 398 F.3d 1040 at 1045.

An "undue hardship" means an action requiring significant difficulty or expense. 42 U.S.C. § 12111(10)(A). The Court considers the following factors: (1) "the nature and cost of the accommodation needed under this Act;" (2) "the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;" (3) "the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities;" and (4) "the type of operation or operations of the covered entity, including the

composition, structure, and functions of the workforce of such

entity; the geographic separateness, administrative, or fiscal

relationship of the facility or facilities in question to the

covered entity." 42 U.S.C. § 12111(10)(B).

   B. *Iowa Code § 216*

      Iowa Code sets forth the following:

      It shall be an unfair or discriminatory practice for any:

         a. Person to refuse to hire, accept, register,
      classify, or refer for employment, to discharge any
      employee, or to otherwise discriminate in employment
      against any applicant for employment or any employee
      because of the age, race, creed, color, sex, sexual
      orientation, gender identity, national origin, religion, ***or
      disability of such applicant or employee***, unless based upon
      the nature of the occupation. If a person with a disability
      is qualified to perform a particular occupation, by reason
      of training or experience, the nature of that occupation
      shall not be the basis for exception to the unfair or
      discriminating practices prohibited by this subsection.

Iowa Code § 216.6(1)(a)(emphasis added).  Under Iowa law,

"disability" is defined as "the physical or mental condition of

a person which constitutes a substantial hardship."  Iowa Code §

216.2(5).  The federal and state definitions are similar, and in

deciding cases brought under Iowa Code § 216, the courts look to

the ADA and its interpreting cases.  **Fuller v. Iowa Department**

**of Human Services**, 576 N.W.2d 324, 329 (Iowa 1998).  Depression

and other psychological disorders are "mental impairments" for

the purposes of disability discrimination under the ADA/ICRA.

**Id.** at 330.

In order to establish a prima facie case for discrimination on the basis of disability, the Plaintiff must show the following: (1) a disability; (2) that she is qualified to perform the essential functions of her position with or without a reasonable accommodation; and (3) an adverse employment action where an inference of discrimination can be made from the circumstances. **Id.** at 329.

The Iowa Supreme Court has indicated that Chapter 216 "permits an employee to establish a discriminatory motive under the third element of a claim as long as the conduct claimed to support the termination is causally related to the disability." **Casey's Gen. Stores, Inc. v. Blackford**, 661 N.W.2d 515, 522 (Iowa 2003)(citing **Boelman v. Manson State Bank,** 522 N.W.2d 73, 77-78 (Iowa 1994)).

An individual that proves discrimination under the Iowa Civil Rights Act is entitled to compensation for actual damages. **Dutcher v. Randall Foods**, 546 N.W.2d 889, 894 (Iowa 1996)(citing Iowa Code § 216.15(8)(a)(8) (1993)). Emotional distress is a component of actual damages. **Id.** The plaintiff does not have to show a physical injury, outrageous conduct, or severe distress to obtain an award for emotional distress. **Id.** (citing **Hy-Vee Food Stores, Inc. v. Iowa Civil Rights Comm'n**, 453 N.W.2d 512, 526 (Iowa 1990)).

**ANALYSIS**

A. *The Plaintiff is a disabled individual who could perform the essential functions of her position.*

Seabrooke's medical condition constitutes a disability under both the federal law and Iowa Code. Seabrooke is diagnosed with post-traumatic stress disorder, depression, and anxiety. For the entire duration of Seabrooke's employment, she was diagnosed with the above conditions.

A "disability" is defined as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual". 42 U.S.C. § 12102(2). Iowa Code defines a disability as "the physical or mental condition of a person which constitutes a substantial hardship." Iowa Code § 216.2(5).

First, Seabrooke's condition constitutes a mental impairment. Minimally, since 2002 Seabrooke has been treated under the direction of physicians or counselors for her post-traumatic stress disorder, depression, and anxiety. She continues to be treated by Abbe Center in West Union, Iowa under by Barb Fey under the direction of Dr. Jones. At the time of Seabrooke's termination she was being treated by Mary Funke under the direction of Dr. Jones. Mary Funke communicated with Frazier on several occasions concerning the status of

14

Seabrooke's mental impairment, including making recommendations to assist Seabrooke.

Second, Seabrooke's mental impairment affects a major life activity. She was hospitalized on at least two occasions during her employment due to her mental health impairment. Her mental impairment is so acute at times that Seabrooke is unable to get out of bed, cook for herself, or perform necessary household chores. At times, her condition causes her suicidal ideations; in October 2008 Seabrooke communicated her suicidal state to Frazier causing Sanders to follow up and provide Seabrooke with a helpline for assistance.

Despite Seabrooke's mental impairment and the severity of its effects when manifested, her employment record is exceptional. In both 2007 and 2008 Seabrooke received excellent annual reviews. She received salary increases on both years as well. In 2008 in particular, Seabrooke was characterized as "the best in Iowa" in her position. Seabrooke's employment record does not just sustain her as a qualified individual, but rather her employment record was the standard by which her position was measured.

However, when her workload expectations became unmanageable, she requested that Upper Iowa work to reduce her workload—a reasonable accommodation. Seabrooke was one of two International Enrollment Advisors. Larimer was the second

15

advisor.  During the last two years of Seabrooke's employment, she serviced several hundred more students than Larimer, who has no known disability.  A reduction in Seabrooke's workload to the level of Larimer would have alleviated the problems Seabrooke was experiencing and Seabrooke could have continued effectively performing her position with minimal adverse effects on her health.  Instead, Upper Iowa maintained Seabrooke's workload and allowed her mental impairment to worsen, and the repercussions there from, until it found a pretextual justification to terminate her.

B. *The Defendant took adverse employment action based on the Plaintiff's disability by failing to reasonably accommodate the Plaintiff's workload, segregating the Plaintiff from the interview process, and treating her differently than similarly situated employees*.

On February 17, 2008, Upper Iowa University placed Seabrooke on administrative leave.  She was directed to abstain from coming onto Upper Iowa property or contacting other employees.  She was officially terminated by a letter dated February 24, 2009.

First, Upper Iowa failed to reasonably accommodate Seabrooke.  Discrimination includes failing to reasonably accommodate an employee's mental or physical limitations, unless the accommodation would create an undue hardship.  Seabrooke requested a reduction in her workload.  Upper Iowa failed to reduce Seabrooke's workload.  42 U.S.C. § 12112(b)(5)(A).  The

16

law requires the employer and employee engage in an interactive process to determine a reasonable accommodation. **EEOC v. Sears, Roebuck & Co.**, 417 F.3d at 797.

Seabrooke made several pleas for assistance with her workload. Upper Iowa's responses were not sufficiently calculated to assist Seabrooke with the excessive demands placed on her. While Upper Iowa will contend that its efforts were made in good faith to assist Seabrooke, its conduct directly contradicts such an assertion. The implementation of lights and glare guards, while appreciated, were not reasonably calculated to assist Seabrooke with her most dire need-her workload. Mary Funke recommended to Frazier that Seabrooke be given a greater access to light; in response, Upper Iowa moved Seabrooke farther away from the window. When the minimal attempts by Upper Iowa were insufficient to assist Seabrooke (because they did not address the real problem), Upper Iowa chose to terminate Seabrooke rather than make a calculated effort to accommodate her workload.

Upper Iowa has demonstrated conduct insufficient to show it engaged in good faith discussions with Seabrooke concerning a reasonable accommodation. In October 2008, Frazier sent an email to Seabrooke demanding medical documentation before it would discuss a reasonable accommodation. This comes after several specific emails (including one email that detailed

17

Seabrooke's diagnoses and GAF functioning level) between Mary
Funke and Frazier. On another occasion in October 2008, Frazier
acknowledged Mary Funke's "**professional** recommendation." The
untimely change of position by Frazier clearly demonstrates the
intent of Upper Iowa to frustrate, not facilitate, any
discussion concerning a reasonable accommodation for Seabrooke.

Upper Iowa will place the majority of its defense of a
reasonable accommodation in the hiring of Cathy Langel.
However, the conduct of Upper Iowa in secretly secluding
Seabrooke from the hiring process (of the individual who was
intended to work closely with Seabrooke to alleviate her
workload) demonstrates otherwise. The act of segregating
Seabrooke from the interview process in a secret coordinated
action constitutes actionable discrimination. *See* 42 U.S.C. §
12112(b)(1). Further, Sanders deliberately lied to Seabrooke
regarding the clandestine hiring. It was of no assistance to
have a less than part time employee who could not do Seabrooke's
job.

Third, Upper Iowa treated Seabrooke differently than
Larimer, who was a similarly situated employee. Upper Iowa
issued reprimands to Seabrooke for alleged acts of employee
misconduct in September and October of 2008. These acts of
alleged misconduct were substantially similar to the actions of
Larimer on February 17, 2001, wherein Larimer entered

18

Seabrooke's office and angrily yelled at Seabrooke.  The
situation was so contentious that Frazier physically removed
Larimer from Seabrooke's office.  However, despite Larimer
initiating the instance of verbal abuse, she was not reprimanded
for her conduct; Seabrooke on the other hand was placed on
administrative leave and subsequently terminated.

Furthermore, Seabrooke and Larimer held the same position
as International Enrollment Advisor.  Despite the same position,
Seabrooke consistently serviced significantly more students than
Larimer.  Despite pleas from Seabrooke to reduce her workload,
Upper Iowa took no remedial action to reallocate students or
duties to Larimer.

C. *The Defendant's basis for terminating the Plaintiff for*
   *conduct was pretextual*.

Upper Iowa will argue that Seabrook was terminated for
misconduct.  Such an assertion is pretextual.  The circumstances
show that Upper Iowa had grown tired of accommodating
Seabrooke's mental impairment until it had opportunity to
terminate her from employment.

On February 11, 2009, just six days prior to the adverse
employment action taken by Upper Iowa, Frazier sent an email to
Tammy Carolan, of Human Resources.  Therein, Frazier states, "I
am afraid the stress of work or some other external issues are
contributing to an extremely poor record of attendance…"

19

Frazier goes on to state, "[w]ith Malaysia being our only significant form of income for IP, the lack of continuity and attendance has resulted in our team in Malaysia stating this is causing problems in our recruitment…" "*Prior to giving this documentation to Jen Chase, UIU lawyer*, I wanted to ask you if the above information is something that from your experience is rare for an employee with this amount of time at the institution." Frazier continues with appreciation of Carolan's "opinion and **confidence**" as they "work through these '**slippery'** issues."

First, the email acknowledges that work is causing Seabrooke problems and influencing her attendance at work. Despite this acknowledgement, nothing is done to reduce Seabrooke's workload in the coming days until she is terminated. Second, the context of the letter with its intended secrecy shows again that Frazier, and Upper Iowa, were looking for a way to alleviate itself from Seabrooke rather than alleviate the excessive workload from Seabrooke. Seabrooke's problem was not difficult to ascertain—she needed a reduction in workload. The solution was not "slippery"—it required discussions with Seabrooke on how best to reallocate her work and redistribute some to equalize her with Larimer and alleviate Seabrooke. What was "slippery" was how Upper Iowa could fashion a manner to terminate Seabrooke despite her mental impairment and make it

appear consistent with federal and state anti-discrimination laws.

Seabrooke's termination, and Upper Iowa's proffered legitimate nondiscriminatory reason are at its very base a pretext.

D. *The Plaintiff is entitled to recover for all damages suffered including: past, present and future lost wages and benefits, past, present and future emotional distress, attorney fees, and punitive damages*.

As a result of the discriminatory termination, Seabrooke has suffered damages in the form of lost wages, lost benefits, emotional distress, and attorney fees. Due to the egregious and intentional nature of Upper Iowa's discrimination, the award of attorney fees is appropriate.

Seabrooke was terminated effective February 26, 2009. Since then, Seabrooke has not been able to find comparable employment and has past damages. Seabrooke has past lost wages in the amount of $68,723.00. Her lost health insurance is $15,903.00. Her lost group insurance is $233.00. Her lost Short Term Disability Insurance is $302.00. She has lost retirement benefits in the amount of $5,443.00. She lost tuition remission for her children in the amount of $28,468.00. Because of losing her employer-sponsored health insurance plan, she has unpaid medication in the amount of $707.00. The emotional distress Seabrooke has suffered as a result of the

discrimination is minimally $50,000. Seabrooke's total past damages are minimally $169,779.00.

Seabrooke has future damages in addition to past damages. Since her termination, Seabrooke has been unable to obtain comparable employment. If she were to have continued with Upper Iowa until age 65, she would have made $421,759.00. Seabrooke will be expected to mitigate her damages; however, she will likely be able to earn approximately $8,500.00 annually henceforth. Her future lost wages amount to $311,259.00. Seabrooke's life expectancy is an additional 31 years. Minimally, the compensation she should receive is $200,000.00. Her lost health insurance benefit until age 65 is $87,451.00. Her lost retirement benefit is $29,523.00. Her lost tuition remission is $64,053.00. Her lost group insurance is $1,261.00. Her lost Short Term Disability Insurance until age 65 is $1,638.00. Because of her lost employer-sponsored health insurance, she will reasonably incur $9,300 in medication costs.

Seabrooke's total past and future damages is in the amount of $874,264.00. This amount is exclusive of attorney fees and punitive damages. Due to the intentional and egregious nature of Upper Iowa's discriminatory conduct, punitive damages are appropriate.

**CONCLUSION**

For the reasons stated herein, the Plaintiff, Lynne Seabrooke has sufficiently stated a prima facie cause of action for employment discrimination on the basis of disability. Seabrooke is disabled by a mental impairment consisting of post-traumatic stress disorder, depression, and anxiety. Until Upper Iowa failed to adequately discuss and reasonably accommodate Seabrooke she was the "best in Iowa" at her position; her record demonstrates that she was adequately qualified to perform per position with or without a reasonable accommodation. Her mental impairment significantly affected a major life activity. Upper Iowa failed to reasonable accommodate Seabrooke and terminated her on the basis of her disability. Upper Iowa's proffered nondiscriminatory reason for the termination was pretextual and an excuse to terminate Seabrooke rather than reasonably accommodate her mental impairment. Upper Iowa's actions were deliberate and egregious. Seabrooke is entitled to damages for the following: (1) past, present, and future lost wages and benefits; (2) past, present, and future emotional distress; (3) reasonable attorney fees; and (4) punitive damages.

**DATED** this 19th day of August, 2011.

Respectfully Submitted,

_/S/Dale L. Putnam_____
**Dale L. Putnam, AT0006463**
**Putnam Law Office**
**801 Commerce Drive, Suite 1**
**P.O. Box 70**
**Decorah, Iowa 52101**
**Tel. (563) 382-2984**
**Fac. (563) 382-8810**
**putlaw@putlaw.com**
**ATTORNEY FOR PLAINTIFF**

CC:   Jennifer Chase
      Max Kirk
      Ball, Kirk & Holm, P.C.
      3324 Kimball Avenue
      P.O. Box 2696
      Waterloo, IA 50704